Per Curiam.

(No. 5202)

Peter Berkin, Administrator of the Estate of Elena Berkin, also known as Joan Ashley, Deceased, and Sara Berkin, Claimants, *vs.* State of Illinois, Respondent.

*Opinion filed December 13, 1972.*

Miller and Koretzky, Attorney for Claimants.

William J. Scott, Attorney General; Saul R. Wexler and Bradley M. Glass, Assistant Attorneys General, for Respondent.

Holderman, J.

A Complaint was filed on December 3, 1964, by Peter Berkin, Administrator of the Estate of Elena Berkin, also known as Joan Ashley, deceased, and Sara Berkin.

The Complaint alleges that Sara Berkin is the owner and/or beneficiary of the claims set forth herein as the mother of Elena Berkin, deceased, arising out of the wrongful death of her said daughter on December 7, 1962.

The deceased was murdered on December 7, 1962, by one Joseph Csanyi.

Joseph Csanyi, former Hungarian Revolution fighter, was admitted to the United States in 1956. He was committed to the Chicago State Hospital on March 17, 1962, by the County Court of Cook County as a schizophrenic of a paranoid type, suffering from hallucinations and delusions of being threatened with death.

On April 10, 1962, the Chicago State Hospital discharged said patient. On July 26, 1962, Joseph Csanyi was again committed to the Chicago State Hospital by the County Court of Cook County.

On November 24, 1962, Joseph Csanyi was conditionally discharged to his own custody by the Chicago State Hospital.

Prior to his first commitment, said Joseph Csanyi worked as a watchmaker for the firm of Schierer and Popp Jewelers. After his first discharge from the hospital, he returned to his former employers on a full-time basis. After his second or conditional discharge, he returned to this employment first on a part-time basis and later on a full-time basis.

When he first worked for the jewelry firm, said Joseph Csanyi returned to the hospital at night but later on his own request, he was allowed to leave the hospital and consequently, found living quarters in the same apartment building as the deceased.

It appears that said Joseph Csanyi was a total stranger to Elena Berkin, though they did live in the same apartment building.

It also appears that said Joseph Csanyi was confined to a mental hospital in the State of Indiana for a short period

of time, the exact period of confinement not being stated in the record.

The record discloses that this individual lived alone, had few friends, one of them being a nurse at the Chicago State Hospital, who spoke Hungarian, and also a doctor.

His work as a watchmaker, according to the record, was excellent and he was a good employee.

It appears that the reason for a condition rather than an absolute discharge was the fact that he had been previously hospitalized and there was a clinical indication that he have available the possibility of re-entering the hospital without any commitment procedures and also for the purpose of maintaining contact with the patient to determine if he had a relapse serious enough to require hospitalization and for the purpose of supervising medication.

It appears that the treatment given him at the hospital consisted of drugs and an attempt to get him to join "Thresholds" which is a group for the purpose of furnishing social therapy to individuals such as Joseph Csanyi. He did not join "Thresholds."

The psychiatrist in charge of this individual testified that the relapse rate is rather high among schizophrenics and that aftercare is important.

The paranoid schizophrenic feels that others are against him and reacts in a bizarre manner and is unpredictable.

Joseph Csanyi would have periods of despondency and expressed the belief that people were following him and talking about him. He was also under the delusion that the Communists were after him.

There is considerable evidence to the fact that this individual would withdraw unto himself and have spells of crying but the record is completely silent as to any acts of

violence of any kind or character. There is not any record of any assaultive behavior after his arrival in this country.

On the 2nd or 3rd of December, 1962, his employer noticed that he seemed more morose than before. At one time he ordered a hamburger which he sat and stared at for a long period of time.

One of his employers, Mr. Schierer, testified that on the 2nd or 3rd of December, 1962, he called a Mr. Jensen, one of the personnel of the Chicago State Hospital, and informed him that Joseph Csanyi seemed to be much worse than he had been.

Mr. Schierer stated that prior to the time he called Mr. Jensen, he would walk back to where Joseph Csanyi was working and would find him in tears, and that after he talked to him for awhile, he would be all right and would continue with his work.

The evidence shows that part of the treatment for Joseph Csanyi had been the use of certain drugs which, according to the doctor, would quiet the patient down and relieve him of his delusions and hallucinations but the record does not disclose whether any of this medicine was administered shortly before or prior to the incident which caused the death of Elena Berkin.

The evidence is to the effect that drug therapy, primarily the use of tranquilizers, was the one favored and used by the doctors of this particular patient.

The evidence also discloses that after the call to the hospital, the condition of Joseph Csanyi, on the first part of December, was not improved. This matter was discussed by the staff of the hospital and the staff recommended that since the patient's work appeared not to be affected and since there had been no history of assaultive behavior, the vocational rehabilitation worker should continue to remain

in contact with the employer in the next few days to note any further regression.

It appears that Joseph Csanyi was not visited by any of the hospital staff and it is not known whether the patient had any antihallucinatory drugs after he left the hospital. There is evidence to the effect that these drugs, if taken, might have possibly prevented the incident in question.

It is the claimant's position that any paranoid schizophrenic is potentially dangerous and that this fact was well known to the State and that because of this condition, Joseph Csanyi should not have been allowed liberties that resulted in the death of the deceased.

The question is whether or not the State, by virtue of the telephone call of December 5, 1962, calling attention to the apparent change in the condition of the patient and the fact that little was done except a telephone call to the patient by the Hungarian-speaking nurse was sufficient notice to the respondent that something should be done seems to be the crux of the present case.

What is reasonable care, under the circumstances, seems to be the criterion adopted by the various Courts in past opinions in similar situations.

The degree of care owed by the State in operating mental institutions is gone into at considerable length in Volume 22, Court of Claims Reports, Page 722. Rule appears to be that the State has to exercise such care that individuals under its custody will not have the opportunity *to inflict a foreseeable injury upon* others.

This brings forth the question whether or not the act of December 7, 1962, was foreseeable by the State and, consequently, one that should have prompted the State to take action which might have prevented the tragedy.

As stated before, the individual in question did not

have any record of any violence of any violent behavior. It is void of any violence of any kind or character and all that does appear is that this individual did have periods of retreat, crying, and hallucinations. There is no evidence of any impulsive actions of any kind or character and completely void of any criminal record.

Under the circumstances, therefore, we do not believe the State was negligent in this particular instance in not keeping this patient confined.

It is therefore the opinion of this Court that claimant is not entitled to an award.