(No. 88-CC-0687-)

CAROL J. ZIMMERMAN, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 10, 1994.*

ROBERT W. BACH, for Claimant.

ROLAND W. BURRIS, Attorney General (THOMAS GRAY, Assistant Attorney General, of counsel), for Respondent.

## OPINION

PATCHETT, J.

This is a claim for injuries which were sustained by the Claimant, Carol J. Zimmerman, when she was attacked by James Armstead. At the time of the attack, Ms. Zimmerman was employed by Correctional Health Services, Inc., which had a contract with the State of Illinois to provide x-ray and other health-related services to the Pontiac Correctional Facility. James Armstead was an inmate at the Pontiac Correctional Facility, which is a maximum security facility operated by the Illinois Department of Corrections.

Following the attack, Ms. Zimmerman's employer paid $29,550 in medical bills, $9,710 in temporary total disability benefits, and $30,000 in a lump sum settlement. The employer waived any lien they had against any monies that might be collected through this claim.

As her first witness, Ms. Zimmerman called Dale Bent. Mr. Bent is currently the chief phlebotomist at Stateville Correctional Center and had been working for the Department of Corrections for eight years at the time

of the attack. He was working at the Pontiac Correctional Center Hospital on that occasion in the lab, which was next door to the x-ray room where Ms. Zimmerman worked. There was no door between the lab and the x-ray processing area. Mr. Bent received blood test results on his computer which was located in the x-ray processing room next to his lab. This made it necessary for him to go into the hallway, down the hall to the door of the x-ray room, and into the processing area to receive the computer report. Ms. Zimmerman knocked on the wall to notify Mr. Bent to come and get the reports when they came in. The door from the x-ray room into the main hallway was steel with one small window about five feet off the floor. There were no windows along the common wall between the x-ray room and the hallway. There was an officer's room next to Mr. Bent's lab, which was approximately 45 feet from the door to the x-ray room. Following the attack, a door was installed between the lab and the x-ray processing room.

The x-ray room and lab had been remodeled in March 1985. After moving in, Bent and Zimmerman discussed with Assistant Warden Washington, who was in charge of overseeing all the hospital programs, the problems caused by the physical layout of the officer's room, lab, and x-ray areas. They specifically noted the problem of access to the x-ray room. They were concerned for both convenience and security reasons. Warden Washington agreed that there were problems with security and access in the new facilities, and he told both Bent and Zimmerman to send him a memo on the subject. Mr. Bent sent a memo to Warden Washington suggesting that a door be installed between the lab and the x-ray processing area in order to improve security and facilitate access to the processing area for both officers and Bent. Mr.

Bent reiterated their earlier discussions concerning the problems with security. No response to the memo was received. About three weeks after the attack on Ms. Zimmerman, the door was installed.

Bent testified that after Ms. Zimmerman was attacked, she knocked on the access panel located in the wall between the lab and the processing room to attract his attention. He went out of his lab and down the hall into the x-ray area, where he saw the Claimant in the x-ray processing room. She was behind the door between that room and the x-ray room. Since Bent did not have a key to this door, and the Claimant was too severely injured to open it, she had to slide the keys under the door. Before opening the door, he ran back to the desk in the x-ray room to call for help. He found the line busy. He then ran into the hall and called for a sergeant who was in the officer's room.

Upon cross-examination, Bent testified that the door leading from the x-ray room to the processing area was self-locking. There was also a self-locking solid steel door between the processing area and the dark room. There were correctional officers stationed in the health care unit. Unless an inmate was actually seeing a doctor, he was to be kept in a holding area, the protective custody holding area, or in the actual in-patient hospital.

There was no alarm button or warning signal in the x-ray area. There was no monitor that allowed the officers to observe what was going on in the x-ray area. The only phone in the x-ray area was in the x-ray room itself. An alarm system, which included a button to summon help, was built into the newly-remodeled infirmary area. Only one person, a nurse, worked in the infirmary area where the alarm was located.

The Claimant testified in her own behalf. At the time of the attack, she was 46 years of age, four feet, eleven inches (4' 11") tall, and weighed approximately 113 pounds. She had six children and began working outside her home in November 1972. She worked part time for three different employers while raising her six children through April 1980. She began x-ray training at Illinois Central College. After graduating as an x-ray technician, she found full-time employment with Correctional Health Services and was assigned to the Pontiac Correctional Center in July 1983.

Ms. Zimmerman participated in the conversation between Assistant Warden Washington and Dale Bent. During that conversation, she expressed concern for her safety, especially in the darkroom and processing room. She also expressed concern about the response time of officers in the event of a problem. A memo from Ms. Zimmerman to Assistant Warden Washington, dated March 18, 1985, was introduced into evidence. The memo suggested that a doorway be installed between the x-ray room and Mr. Bent's lab, and also referred to Bent's memo of March 15, 1985. There was never a response from Assistant Warden Washington, nor any action taken as of October 29, 1986, to improve access to the x-ray suite. No alarm system or monitors were installed in the x-ray area. As stated previously, there were no windows between the lab and the hallway.

Ms. Zimmerman was never given instructions with regard to self-defense or security when dealing with prisoners. She was not supplied with self-defense equipment; in fact, such items were expressly prohibited.

When prisoners were to be x-rayed, they would come into the x-ray lab with either a requisition from the prison doctor or a pass. The Claimant would let them into

the lab area and x-ray them, either at the examining table or at the wall. While the x-rays were being performed, she would stand behind the protective lead wall in the x-ray room. She then would send the inmates back to the holding area. Afterwards she would take the film to the film processor, which was located in a separate room located between Bent's lab and the x-ray room. There was a self-locking door between the x-ray room and the processing room. While the x-rays were being performed, the door from the x-ray room to the hall would be closed to prevent radiation from going into the hall. Ms. Zimmerman could not see out the window in this door because it was too high off the floor. She was never instructed to keep the door between the processing room and the x-ray lab closed. Ms. Zimmerman would take twelve to fifteen x-rays per day. She assumed the inmates would be screened by the doctor who saw them for violent propensities. Only those inmates who were from protective custody were escorted by guards. There had never been a guard assigned to her on a regular basis. If an inmate from protective custody was having an x-ray, the guard would stand behind the protective lead wall with the Claimant.

On October 29, 1986, inmate James Armstead came for a finger x-ray. Armstead was described as being approximately six feet tall, 180 pounds, and very muscular. He seemed cooperative and calm on that occasion. She x-rayed his finger and sent him back to the holding area while she went back to process the x-ray film. After she put the film in the processor, she heard a knock at the door from the x-ray room to the hallway. She found Armstead, who told her that she had x-rayed only one finger. Supposedly, two had been injured. Since she was unsure whether she had overlooked something on the requisition,

she had Armstead sit at the x-ray table while she checked the requisition. It indicated that only one finger was to be x-rayed. She then attempted to call the emergency room doctor to ask if she should x-ray the other finger. The line was busy. As she was hanging up the phone, she heard the film coming out of the processor and went into the processing room to get it. While in the processing room, she felt a presence behind her. She turned to find Mr. Armstead in the room with her.

Armstead said, "I'm going to kill you, bitch!" He then knocked her to the floor, choking and beating her on the face. Ms. Zimmerman temporarily lost consciousness during the attack. She awoke to find Armstead continuing his attack on her. She tried to poke him in the eyes and squeeze his groin to get him off of her. This was unsuccessful. Her last thought before losing consciousness was, "I'm gonna die."

After regaining consciousness again, she noticed the door between the lab and the processing room was closed. She tried to scream, but no one heard her. She pulled herself up to a standing position and noticed that she was unable to see except for a small area out of the right eye. She went to the plumbing access panel between the lab and the processing room and banged on it to alert Bent. She and Bent had previously agreed that if she had trouble, she would knock continuously.

After a short time, Bent came to the door leading into the processing room. The Claimant could not open it because her hands were bloody and kept slipping off the knob. She finally slid the keys under the door, and Bent opened the door from the other side.

Ms. Zimmerman was taken from Pontiac Prison to St. James Hospital. She was in intensive care for the first

day and night. She experienced severe pain in the head, neck, shoulders, knees, and generally throughout her body. She stayed at the hospital for four days before she was released. After her release, she was apprehensive, unable to sleep, and extremely frightened. Although she had lived alone in an apartment in Pontiac prior to the attack, she felt she could not be alone after the attack. She lived with different relatives for periods of time because she was too weak to take care of herself. Due to the injuries to her eyes, she experienced blurred vision for several weeks.

On December 1, 1986, approximately one month after the attack, Ms. Zimmerman was living with her daughter, Linda Pfister. She began having psychotic episodes. She made a telephone call to her daughter-in-law and told her to take her son, Joey, out of the house because Danny, Ms. Zimmerman's son, was going to kill him. During the course of the evening on December 1, 1986, Ms. Zimmerman believed that her mother's face turned into someone else's. She became combative and tried to hit her mother. She was taken to St. Francis Hospital and remembers being combative before she lost consciousness. She woke up in the morning strapped to a bed and locked in her room at the psychiatric unit at St. Francis Hospital in Peoria. She was kept in isolation for two or three days. She then began seeing Dr. Remolina, a psychiatrist. She was prescribed Haldol, a neuroleptic, and Norpramin, an antidepressant. In addition, she attended group therapy sessions. She was discharged on her own request just before Christmas 1986 and went to live at the St. Augustine Manor.

In January 1987, Ms. Zimmerman noticed that she was very confused and had difficulty dealing with any kind of stress. During a trip to California to visit relatives,

she experienced intermittent periods of crying, inability to concentrate, and great fear. She had never experienced any of these problems before the attack.

In February 1987, Ms. Zimmerman returned to St. Francis Hospital to visit a friend and became overwhelmed. She was unable to function and was admitted to the hospital psychiatric unit. On this occasion, she was hospitalized for approximately three weeks. She received medication and therapy under the care of Dr. Remolina. After her release from the hospital, Ms. Zimmerman began living in a rental house. She continued to see a psychiatrist on an out-patient basis and was taking Asendin, an antidepressant, and Loxitane, a neuroleptic. She also saw a psychologist on two or three occasions.

On June 16, 1987, Ms. Zimmerman attempted to return to Pontiac Correctional Center in her old job as an x-ray technician. She worked at Pontiac for three weeks and four days. At that point, she felt overwhelmed again, and she did not feel safe working at the hospital. She asked Vickey Bibey, who was at that time the hospital administrator, to have a guard present in the x-ray room while working. No guard was posted in the area. On July 17, 1987, Ms. Zimmerman considered suicide. She was once again hospitalized at St. Francis. During this hospitalization, she was administered electroshock therapy on six occasions. She remained hospitalized in the psychiatric unit for one month and began seeing Dr. Pinto, another psychiatrist.

In November 1987, approximately one year after the attack, Ms. Zimmerman returned to work for the first time since her three-week work period at Pontiac Prison in June 1987. She was employed by Peoria Ear, Nose and Throat as an x-ray technician on a full-time basis and made approximately $8 an hour. She worked at this job

for approximately two months. She felt the job was overwhelming and had difficulty learning the new aspects of it. She left that employment on January 22, 1988, after being terminated. She next worked at Central Illinois Hearing Aid Center in April 1988, making $4 an hour. She worked there for five months before quitting due to the fact that she did not feel she could handle the job. From August 1988 to February 1989, Ms. Zimmerman worked one day a week as an x-ray technician at Midwest Medical Services and also cleaned houses. She earned approximately $125 per week between the two jobs. Ms. Zimmerman felt relieved that she could handle working as an x-ray technician for one day a week.

In March 1989, Ms. Zimmerman began working for East Peoria Multi-Specialty Group as an x-ray technician earning $9 an hour on a full-time basis. She continued to work there until July 6, 1990, at which time she was fired. Ms. Zimmerman stopped taking the medications and seeing Dr. Pinto in September 1988. At the time of the hearing, she was not seeing any doctors or taking any prescriptions. She was working at Midwest Medical Services one day a week earning $10 an hour. She did not expect this job to become full-time employment.

Before the attack took place, Ms. Zimmerman never experienced feelings of being overwhelmed by her work duties. She has never been terminated from a job, and she has never felt fearful for her personal safety. She now feels unsafe in crowds and in the presence of strangers.

Ms. Zimmerman testified that she filed a suit in Livingston County against James Armstead for the attack. She received no funds or proceeds from a judgment obtained against him in the amount of $350,000. Her only recovery to date has been as a result of worker's compensation. The total award was approximately $30,000.

Linda Pfister, Ms. Zimmerman's daughter, testified that while she was growing up, Ms. Zimmerman cared for her six children, being almost totally in charge of income production, household management, and raising the children. Ms. Pfister testified that Ms. Zimmerman received very little help from Mr. Zimmerman. Ms. Pfister described her mother as mild-mannered, timid, and very easy to get along with prior to the attack. She was a good mother who handled the stress of working and raising a family without complaint. After the attack, Ms. Pfister noticed that her mother was very fearful, could not eat, and could not sleep. She noticed that even when she attempted to help her mother by paying bills, her mother was very suspicious and paranoid. She describes her mother now as very susceptible to any sort of stress and unable to handle people or work. Her mother is also now more irritable and gets upset easily. She has a hard time controlling her emotions, and her personality is almost the opposite of what it was prior to the attack.

Ms. Zimmerman introduced the testimony of Dr. Remolina. Dr. Remolina was a psychiatrist licensed to practice in the State of Illinois who first saw the Claimant during her first admission to the St. Francis Hospital psychiatric unit. On that occasion, Ms. Zimmerman appeared to have difficulty dealing with reality and her emotions. She was very irritable and agitated. The doctor testified that the history obtained from the Claimant was that she had been attacked by an inmate in October 1986 and had no prior history of psychiatric difficulties. Dr. Remolina's diagnosis was that the Claimant was suffering from an acute psychotic episode with depressive manifestations consistent with a depressive disorder. As previously indicated, he prescribed medications and followed her on an out-patient basis.

Dr. Remolina testified that during the second hospitalization, his diagnostic impression was once again that of

manic depressive disorder. He prescribed different medications, as previously indicated. Once again, after her release Dr. Remolina continued to see her on an outpatient basis.

In July 1987, after attempting to return to work at the prison, Ms. Zimmerman was once again admitted to the psychiatric unit. On that occasion, she was very depressed and he was concerned about the possibility of suicide. At that point, Dr. Remolina felt that her condition was one of major depressive disorder recurrent, meaning that she continued to suffer recurrence of the symptomatology of depression. She was treated during this hospitalization with medication and electroshock treatments. After she was discharged on that occasion, she started seeing Dr. Arun C. Pinto, who had been covering for Dr. Remolina during his vacation.

In Dr. Remolina's opinion, Ms. Zimmerman was experiencing anxiety, lack of motivation, difficulty in decision making, difficulty in concentrating, physical symptoms, and an inability to carry on the ordinary affairs of daily life. These were all symptomatic of psychiatric depression. He further opined that there was a direct and definite causal connection between the attack and the psychiatric problems. He felt that Ms. Zimmerman would continue to have problems in holding a job, and that stressful types of situations could definitely influence a recurrence of her depressive disorder.

Ms. Zimmerman also introduced the testimony of Dr. Pinto. Dr. Pinto is also a psychiatrist, board certified in both adult and child psychiatry. He obtained a history from Ms. Zimmerman that she had been a fairly well-functioning woman until she was attacked at the prison. The history included the possibility that she had been raped. There was no history of any previous psychiatric

problems. Psychological testing done while in the hospital indicated that Ms. Zimmerman had no evidence of minimum, major, psychiatric, or personality deviation problems other than a major depression recurrent. This depression had a definite post-traumatic quality to it.

Dr. Pinto began seeing Ms. Zimmerman on an outpatient basis after she was released from the hospital in August 1987. He noted that she had substantial problems with employment. He described Ms. Zimmerman as a person who tried very hard to cut down on her medication so that she would be able to feel more confident. On each visit, he would try to decrease the medicine. Dr. Pinto's opinion was that the Claimant's problem in holding a job following her attack was caused by her feelings of being overwhelmed, inadequacy, and of not being fully functional. These were consistent with his diagnosis of a depressive disorder.

In Dr. Pinto's opinion, there was a direct causal connection between the attack of October 29, 1986, and Ms. Zimmerman's psychiatric problems. He felt her prognosis was guarded. He stated that she could continue to have difficulty for a while, and maybe forever, based on this injury. The doctor stated that the difficulty he referred to would manifest itself in terms of feeling inadequate, unsafe, a lack of trust of other people, and inability to maintain employment. Given the history of Ms. Zimmerman's difficulties for over a year following the attack, Dr. Pinto believes that the disability is permanent.

Ms. Zimmerman also introduced into evidence the disciplinary records of James Armstead. These records reveal that Armstead was sentenced to twenty years in the Department of Corrections for the offense of rape and six years for the offense of residential burglary. He was a parole violator who was sentenced as a career offender.

He entered the Joliet Correctional Center on November 2, 1983. He remained at Joliet until February 1986, when he was transferred to the Logan Correctional facility, a medium security facility. He remained at Logan for only seven months, until September 1, 1986. At that point, he was re-classified as a maximum security risk and transferred to Pontiac. He was involved in a physical altercation with another inmate on August 31, 1986, and had a physical altercation with a guard in November 1984. His record contains references to psychiatric problems, suicidal thoughts, suicidal ideation, and sexual deviation. All this information regarding James Armstead was contained in his master file prior to October 29, 1986.

The Claimant has the burden of proving by a preponderance of the evidence that the State was negligent for failing to exercise reasonable care over an individual in order to prevent foreseeable injury to Carol J. Zimmerman. The Claimant has overwhelmingly satisfied this burden. Despite the extremely serious nature of the disciplinary record of the inmate in question and his documented psychiatric problems, he appeared at the door of the x-ray room on the day in question completely unescorted by guards. During the time the Claimant x-rayed Armstead's finger, she had no means of communicating with persons outside of the room other than the one telephone in the x-ray room. She had no means of protecting herself from attack and no means to make others aware of an attack once it had begun. In addition, there was no way for anyone outside the x-ray suite to observe what was going on within these rooms.

The law in the State of Illinois is clear that the State has to exercise care that individuals under its custody will not have the opportunity to inflict foreseeable injury upon others. (*Berkin v. State* (1972), 28 Ill. Ct. Cl. 154.) In this

case, the State not only failed to exercise that care, they virtually made such an attack by an inmate inevitable. Armstead, who was six feet tall and weighed 180 pounds, was left completely alone with a woman who was four feet, eleven inches tall and weighed 113 pounds. The facts clearly show a breach of the Respondent's duty to care. The Respondent was clearly put on notice of the problems in the x-ray suite by the memos of Bent and the Claimant. Corrective action was taken immediately after the attack.

A guard could have been assigned to escort Armstead and other inmates in need of x-rays. Testimony showed that inmates in protective custody were in fact supervised by guards. Respondent argued in its brief that the cost of providing guards to escort all inmates during x-rays would be too costly and therefore impracticable. No such evidence, however, was presented by the Respondent at trial. Furthermore, it is clear that guards are present at all times in this area of the hospital facility. Testimony from Bent and the Claimant indicated that the officer's room was only a short distance down the hall from the x-ray suite. The court finds that there was no practical reason why guards could not have been available to escort inmates into the x-ray room, considering the physical layout of the x-ray facility. As previously indicated, there was no alarm or monitors installed in the x-ray unit. Incredibly, the only signal available to the Claimant was knocking on the plumbing access panel in the wall between the x-ray processing room and the lab in which Bent worked. There was no evidence introduced by the State to show that installing an alarm or a monitor were infeasible, impracticable, or unnecessary. It defies reason that a civilian employee left alone in an x-ray suite in a maximum security facility would have no means to summon help, other than to bang on a wall.

In its brief, the Respondent argues that the evidence fails to show the attack was foreseeable. This argument is totally without merit. Foreseeability only requires that the risk to the victim involve a recognizable danger, based upon some knowledge of existing facts, and some reasonable belief that harm may follow. (Prosser on Torts ch. 5, sec. 31, at 146 (4th ed.).) It is uncontroverted that both Ms. Zimmerman and Dale Bent discussed with the assistant warden the problems regarding security. In fact, the evidence suggests that Assistant Warden Washington agreed that security problems existed. Nothing, however, was done to correct the situation until after the attack. This clearly shows that the State was on notice with regard to the need for better access to this area.

Based on the facts stated above, we find liability.

The sole remaining issue is that of damages. The Claimant's damages are limited to $100,000 pursuant to the provisions of 705 ILCS 505/8(d). The evidence introduced by the Claimant would justify an award far in excess of this. Photographs of the Claimant introduced into evidence graphically portrayed the horrible physical injuries which she suffered as a result of this unprovoked, brutal attack. As a result of the attack, she was hospitalized in a psychiatric unit on three separate occasions. She received numerous medications and electroshock treatments. It is not an exaggeration to say that her entire personality and her life were irreparably damaged as a direct result of this attack. The immense pain and suffering, both physical and mental, suffered by Ms. Zimmerman was shown by clear and uncontroverted evidence.

Evidence established that the Claimant has had difficulty holding any job since the attack which involves the slightest stress. Prior to the attack, she was making $353.08, or $18,360.16 per year. In 1987, her total gross

income from all sources was $6,464, and in 1988 her total income was $7,733. Lost wages for those two years alone amount to $23,123.32. At the time of the hearing in this case, she was working one day a week, eight hours a day, for $10 per hour. Assuming that at age 50 she is going to work for another 15 years, these facts would support a claim for future lost wages in the amount of $213,000.

In regard to the medical damages in this case, the parties stipulated that $29,550 was paid by workers' compensation. Arguably, there could be a set-off of $4,500 pursuant to section 2—1205.1 of the Code of Civil Procedure (735 ILCS 5/2—1205.1.) However, this amount, as well as the $30,000 lump-sum settlement paid to the Claimant, and the $9,703.68 payment for temporary total disability was obtained by reason of the employer's statutory obligation under workers' compensation. The case of *Paschal, Buesing Bros. Trucking, Inc. v. State* (1990), 43 Ill. Ct. Cl. 229, controls with regard to the question of set-offs in this matter. That case, citing *Sallee v. State* (1990), 42 Ill. Ct. Cl. 41, holds that workers' compensation payments are not to be "set-off" unless the employer has filed its lien as per the Workers' Compensation Act. The employer's lien can then be satisfied from the award of the Claimant. Both the *Sallee* case and *Paschal* case are based upon an interpretation of section 26 of the Court of Claims Act (705 ILCS 505/26), which states:

"There shall be but one satisfaction of any claim or cause of action and any recovery awarded by the court shall be subject to the right of set-off."

Both *Sallee* and *Paschal* hold that the law in the State of Illinois is that the collateral source rule is now applicable in the Court of Claims. The collateral source rule would be invoked to deny a set-off of workers' compensation payments since they arise from an independent statutory source. The collateral source rule holds, in effect, that

a tortfeasor is not entitled to a set-off for any sum paid from a source created by the plaintiff. Only in a case where a joint tortfeasor has made a payment to the plaintiff should that amount be set-off. The principle which underlies this rule is fully discussed in the Restatement of Torts, specifically section 920(a), which states as follows:

"920A. Effect of Payments made to Injured Party.

A payment made by a tort feasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another, who is, or believe he is, subject to the same tort liability.

Payments made to or benefits conferred on the injured party from other sources are not credited against the tort feasor's liability although they cover all or a part of the harm for which the tort feasor is liable. Therefore, under Illinois law, the Defendant is not entitled to the benefit of credits which he did not help to create. This has been held to be the law in this State for many years with regard to a variety of different types of payments received by injured parties, including workers' compensation payments. (*Bryntesen v. Carroll Construction Co.*, 36 Ill. App. 2d 167, 184 N.E.2d 129, affirmed (1962), 27 Ill. 2d 566, 190 N.E.2d 315; *Rylander v. Chicago S.L.R. Co.* (1959), 17 Ill. 2d 618, 161 N.E.2d 812)."

In this case, Ms. Zimmerman's employer is not a joint tortfeasor. Her cause of action against the employers arises not from tort, but from its statutory obligation under the Workers' Compensation Act of this State. Therefore, the employer's payments arise from a "collateral source." No set-off will be allowed as a result of the workers' compensation payments.

Finally, the Respondent argues that the Claimant is not entitled to an award because judgment was entered against the inmate who attacked her in the amount of $350,000. The record in this case clearly shows that a stipulation was entered into by counsel for both parties that the only claim for set-off by the Respondent would be for medical expenses paid as a result of the workers' compensation. We find that stipulation binding on subsequent counsel for the Respondent. In addition, however, a judgment against an inmate serving a lengthy prison term with

no obvious source for paying the judgment does not prohibit a Claimant from recovering from the State of Illinois. The Claimant has a duty to exhaust her remedies. She did that by suing Armstead and receiving the $350,000 judgment. The argument advanced in the Respondent's brief to the effect that any monies for which Armstead is liable should be set-off against the award of this Court, whether or not Armstead paid them, ignores the clear meaning of section 26 of the Court of Claims Act. Therein, the words "satisfaction" and "recovery" are clearly used to indicate that a set-off only applies to monies collected. In this case, the uncontroverted testimony was that no monies had been collected as a result of the judgment against Armstead. The Respondent's theory of set-off is not supported by any prior decision of this Court.

In summary, the Claimant has overwhelmingly met her burden of proof. Respondent's negligence clearly was a proximate cause of her injuries. We award Carol J. Zimmerman the sum of $100,000.